UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ETHAN EDGERTON,

Plaintiff,

v.

AVENUE5 RESIDENTIAL LLC, *et al.*,

Defendants.

CASE NO. 2:26-cv-02650-GJL

ORDER ON DEFENDANT'S MOTION TO COMPEL ARBITRATION, DISMISS CLASS CLAIMS, AND STAY ACTION PENDING ARBITRATION

This matter is before the Court on the Motion to Compel Arbitration, Dismiss or Strike Class Claims, and Stay Action Pending Arbitration ("Motion") of Defendant Avenue5 Residential LLC ("Defendant").[1] Dkt. 8.

Defendant requests this Court (1) enforce the parties' Mutual Arbitration Agreement ("Agreement") (Dkt. 8-2 at 12–16) and compel Plaintiff to pursue his individual claims in arbitration; (2) enforce the class action waiver in the Agreement and dismiss or strike the class

[1] The parties have consented to proceed in this action before a United States Magistrate Judge. Dkt. 13. Defendants Does 1 through 10 have not yet been identified nor have they appeared in this matter. *See* Dkt. 1-2. Accordingly, the Court finds Defendants Does 1 through 10 will not be prejudiced by granting this Motion.

allegations from the Complaint; and (3) stay this action pending the completion of arbitration. Dkt. 8 at 6.

Plaintiff Ethan Edgerton ("Plaintiff") objects on the grounds that (1) Defendant has failed to prove he accepted the Agreement; (2) the Agreement was procedurally unconscionable because Defendant denied him any meaningful choice; (3) the Delegation Clause in the Agreement is substantively unconscionable because Defendant retained unilateral power to stay proceedings, suspend and reduce fees, and seek judicial declarations; (4) the Agreement is further substantively unconscionable because its provisions advantage Defendant and disadvantage Plaintiff; and (5) unconscionability "taints the entire [A]greement[.]" Dkt. 17 at 7.

Because the Agreement between Plaintiff and Defendant has an enforceable Delegation Clause, the Court **GRANTS** Defendant's Motion to Compel Arbitration.

## I. BACKGROUND

Plaintiff was employed by Defendant as a non-exempt hourly employee in in the position of "Leasing Consultant" in Puyallup, Washington. Dkt. 8-2 at 3. Plaintiff's employment with Defendant ended on June 22, 2026. *Id.* On June 11, 2026, Plaintiff filed a class action in the Superior Court of the State of Washington for King County, asserting eight causes of action for alleged wage and hour, noncompete, and statutory violations, all arising directly out of and relating to his employment with Defendant. Dkt. 1-2. Defendant subsequently removed the instant action to this District Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). Dkt. 1. Defendant now moves to compel Plaintiff to arbitrate his individual claims. Dkt. 8.

Defendant uses My5, an online platform, to collect, store, track, and administer general personnel and human resources information. Dkt. 8-2 at 3–4. Defendant also uses My5 to

onboard employees, disseminate onboarding documents and policies, and collect electronic signatures. *Id.* Before Plaintiff began his employment, Defendant sent an email via My5 to the personal email address that Plaintiff provided to Defendant. *Id.* at 5. The email prompted Plaintiff to establish a My5 account and access Defendant's onboarding portal. *Id.* According to Defendant's records, Plaintiff set up a My5 account on November 22, 2024. *Id.*

On December 3, 2024, Defendant sent an email to "Edgerton, Ethan A" with a request to complete an onboarding task labeled "Avenue5 Residential | Arbitration Agreement | New Associate" by December 6, 2024. Dkt. 19-1 at 3, 6. Defendant's records suggest "Edgerton, Ethan A" accessed the My5 onboarding portal and the onboarding documents on four occasions on that date. Dkt. 19-1 at 4, 8–9.

Plaintiff began his period of employment with Defendant the following day on December 4, 2024. Dkt. 8-2 at 3; Dkt. 17-2 at 2. Defendant's records indicate "Edgerton, Ethan A" accessed the My5 onboarding portal and the onboarding documents at least three more times between December 4, 2024, and December 6, 2024. Dkt. 19-1 at 9–13. Defendant's My5 records further contain an e-sign document titled "Avenue5 Residential | Arbitration Agreement | New Associate" ("Acknowledgement") (Dkt. 8-2 at 8–9) which is stamped at the top with the following statement in red italics: "Acknowledged on 12/06/2024 11:19:14 AM by E. Edgerton." Dkt. 8-2 at 8.

The Acknowledgement contains nine sentences. *Id.* The first sentence states, "This is to acknowledge that I have received and read a copy of the Arbitration ProgramOverview [sic], Questions and Answers, and Mutual Arbitration Agreement[.]" *Id.* The last two sentences of the Acknowledgement states, "By clicking on the 'Acknowledge' button, I represent that I have reviewed and am accepting and agreeing to be bound by the terms of the Agreement. I also

acknowledge and agrees [sic] that by clicking on the 'Acknowledge' button, I am binding myself to the Agreement just the same as if I had signed the Agreement in ink." *Id.* at 8. A window that provides a document preview of the Arbitration Program Overview, Questions and Answers, and Agreement exists at the bottom of the Acknowledgement, just below the nine sentences of acknowledgement. *Id.* at 9. The Agreement itself only contains Defendant's signature. *Id.* at 16.

Plaintiff does not deny that he received access to a document titled "Avenue5 Residential | Arbitration Agreement 2023" in his My5 onboarding portal. Dkt. 17-2 at 3. Rather, Plaintiff's My5 onboarding portal demonstrates he had access to "Avenue5 Residential | Arbitration Agreement 2023" as an "E-Signed Document" and he "[a]cknowledge[d]" it on his third day of employment, on December 6, 2024, at 11:19:14 A.M. Dkt. 17-1 at 4. However, Plaintiff states he "felt rushed to move quickly through the onboarding process." Dkt. 17-2 at 2. He further avers:

> I had been told that I needed to finish my onboarding documents that day by my Property Manager Jeri, but at the same time, I was job shadowing, handling normal day-to-day work responsibilities, and assisting with leasing at the front desk. I clicked through the screens as instructed and did not read or understand the terms of the documents.

*Id.* Plaintiff's My5 onboarding portal demonstrates he "[a]cknowledge[d]" or "e-[s]igned" all ten "E-Signed Documents" within approximately ten minutes. Dkt. 17-1 at 4; Dkt. 17-2 at 2. Plaintiff states he does not recall seeing the Agreement:

> I do not recall signing an arbitration agreement, nor do I recall signing any document mentioning the word "arbitration." I recall completing what was described as routine digital onboarding forms in the beginning of my employment. I recall attempting to complete these onboarding forms as quickly as possible in order to begin working, but I do not remember being told or shown that a binding arbitration contract was included among those documents.

Dkt. 17-2 at 2.

The Agreement contains a Delegation Clause ("Delegation Clause") in Section 3 of the Agreement, which states:

> Additionally, the arbitrator, and not any federal, state, or local court, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this Agreement. However, the preceding sentence shall not apply to the waivers of "Class, Collective, and/or Group Actions" (Section 8) and "Representative Actions" (Section 9) described below. Regardless of anything else in this Agreement, and/or the AAA rules or procedures, any dispute relating to the interpretation, applicability, or enforceability of the waivers of Class, Collective, and/or Group Actions (Section 8) and Representative Actions (Section 9) in this Agreement may only be determined by a court and not an arbitrator.

Dkt. 8-2 at 12.

## II. LEGAL STANDARD

The parties do not dispute that the Federal Arbitration Act governs the instant case. Dkt. 8 at 10; Dkt. 17 at 7. The Federal Arbitration Act ("FAA") reflects both a "liberal federal policy favoring arbitration," and the "fundamental principle that arbitration is a matter of contract[.]" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) and *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)) (citation modified). By the FAA's terms, "a written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any [appropriate] United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* at § 4.

"Where there is no conflict between the FAA and the substantive statutory provision, the FAA limits courts' involvement to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Munro v. Univ. of S.*

*California*, 896 F.3d 1088, 1091 (9th Cir. 2018) (quoting *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008)) (citation modified). "If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Id.* (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). These gateway issues, however, "can be expressly delegated to the arbitrator where 'the parties clearly and unmistakably provide otherwise.'" *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) (emphasis omitted).

"When deciding whether the parties agreed to arbitrate a certain claim (including arbitrability), courts generally … apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Likewise, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). "Any doubts about the scope of arbitrable issues, including applicable contract defenses, are to be resolved in favor of arbitration." *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1022 (9th Cir. 2016).[2]

//

//

---

[2] "Like federal law, Washington has a strong public policy favoring enforcement of arbitration agreements." *Hauenstein v. Softwrap Ltd.*, No. 07-CV-0572-MJP, 2007 WL 2404624, at *2 (W.D. Wash. Aug. 17, 2007) (citing *Adler v. Fred Lind Manor,* 153 Wn.2d 331, 341 n. 4 (2004)). Washington's Uniform Arbitration Act provides:

> On motion of a person showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to the agreement ... [i]f the refusing party opposes the motion, the court shall proceed summarily to decide the issue. Unless the court finds that there is no enforceable agreement to arbitrate, it shall order the parties to arbitrate. If the court finds that there is no enforceable agreement, it may not order the parties to arbitrate.

Wash. Rev. Code § 7.04A.070.

## III. DISCUSSION

The parties do not dispute that the Court is limited to determining (1) whether a valid agreement to arbitrate exists and (2) whether the agreement encompasses the dispute at issue. *See* Dkts. 8, 17, 19. *Munro*, 896 F.3d at 1091 (citing *Cox*, 533 F.3d at 1119).

"As to the former, the Court must make the threshold determination that a valid contract was formed before ordering arbitration." *Showalter v. Apartment Mgmt. Consultants LLC*, 754 F. Supp. 3d 1074, 1077 (W.D. Wash. 2024) (citing *Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213, 1217 (9th Cir. 2008)). As to the latter, the presence of a delegation clause "limits the issues that a court may decide." *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1194 (9th Cir. 2024) (quoting *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022)). Such a clause "delegates to the arbitrator gateway questions of arbitrability, such as whether the agreement covers a particular controversy or whether the arbitration provision is enforceable at all." *Caremark*, 43 F.4th at 1029 (citing *Rent-A-Center*, 561 U.S. at 68–69). "When the parties have clearly and unmistakably delegated questions regarding arbitrability to the arbitrator, the court need not conduct further inquiries beyond the existence of the arbitration agreement." *Fli-Lo Falcon*, 97 F.4th at 1194 (citation modified); *see also Caremark*, 43 F.4th at 1030 ("[I]f the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance.").

### A. A Valid Agreement to Arbitrate Exists

"When deciding whether an agreement to arbitrate exists in the context of a motion to compel arbitration, district courts apply a standard similar to the summary judgment standard of Federal Rule of Civil Procedure 56." *Bennett v. T-Mobile USA, Inc.*, No. 2:22-CV-01805-LK,

2024 WL 229580, at *5 (W.D. Wash. Jan. 22, 2024) (quotation omitted). The party seeking to compel arbitration bears "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomm. Am.*, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoting *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)). "This burden is substantial and the Court must give the party denying the existence of an agreement 'the benefit of all reasonable doubts and inferences that may arise.'" *Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1188 (W.D. Wash. 2024) (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)).

In determining whether an agreement to arbitrate exists, the Court applies ordinary state-law principles governing the formation of contracts. *Kaplan*, 514 U.S. at 944 (1995); *Norcia*, 845 F.3d at 1283. The parties agree that the question of contract formation is one for this Court to decide and the laws of Washington apply. Dkt. 8 at 12–13; Dkt. 17 at 8.

In Washington, "[a]rbitration agreements stand on equal footing with other contracts." *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 491 (2020) (citations omitted). "[A] contract is formed when mutual assent exists, which generally consists of offer and acceptance." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019) (citing *Weiss v. Lonnquist*, 224 P.3d 787, 792 (2009)); *accord Keystone Land & Dev. Co. v. Xerox Corp.,* 94 P.3d 945, 949 (2004). "Like many states, Washington does not allow parties to shirk contract obligations if they had actual or constructive notice of the provisions." *Wilson*, 944 F.3d at 1219.

The parties dispute whether Defendant has shown by a preponderance of the evidence that Plaintiff assented to the Agreement. Dkt. 17 at 8–10; Dkt. 19 at 8–9.

Defendant has demonstrated that Plaintiff established his personal My5 account before beginning employment, accessed onboarding forms between December 3, 2024, and December

6, 2024, received a hyperlink to the Acknowledgement on December 3, 2024, and completed the Acknowledgement on December 6, 2024. Dkt. 8-2 at 3–6, 8–9; Dkt. 19 at 2–4, 6, 8–13. Plaintiff does not deny that he had access to onboarding forms in his personal My5 account and admits that he did toggle through and acknowledge certain onboarding e-signature documents. Dkt 17-2 at 2–4; Dkt. 17-1 at 4. Instead, Plaintiff argues that Defendant has not shown Plaintiff was presented with the Agreement itself. Dkt. 17 at 8–9. However, Defendant's exhibit, Dkt. 8-2 at 8–9, establishes that the Agreement was included below the Acknowledgement, which Plaintiff received via email on December 3, 2024, and which was located in the "Onboarding EEDocuments" that Plaintiff accessed at least seven times. *Id.*; Dkt. 19-2 at 6, 8–13.

Plaintiff further argues, "[t]he onboarding portal shows that I never executed an actual electronic signature on either document, nor was I informed that clicking "Acknowledge" meant I was agreeing to arbitrate claims or waive my legal rights[,]" but neither argument is persuasive. *Id.*

First, the text of the Acknowledgement is plain. The document not only required employees to acknowledge they "understand [the Agreement's] terms" but also required employees to acknowledge that the Agreement "contains a binding arbitration provision" which "requires that all disputes covered by the Agreement must be submitted to arbitration … rather than to a judge and jury in court." Dkt. 8-2 at 8; *see also* 19-1 at 15.

Second, an actual electronic signature was not required. Toggling the button conspicuously designated as "Acknowledge" was sufficient. *See e.g.*, *Reed v. Scientific Games Corp.*, No. 18-CV-0565-RSL, 2021 WL 2473930, at *3 (W.D. Wash. June 17, 2021) (finding Plaintiff's click of a button that stated "Accept!" amounted to mutual assent because the button was conspicuous and "let her know that she was accepting something" unlike a button that said

"Let's Play" or "Spin!"); *cf. Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)) (reasoning that an enforceable agreement may be found where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."). The legal materiality and effect of toggling an acknowledgment button is particularly definitive where, as here, the button accompanied the unambiguous text of the Acknowledgement, which itself states:

> This is to Acknowledge that I have received and read a copy of the [Agreement.] … I acknowledge that … I have read the Agreement, [and] I understand its terms, and … I have voluntarily decided to accept the terms of the Agreement[.] … By submitting this acknowledgment, I agree to be bound by the Agreement[.] … By clicking on the "Acknowledge" button, I represent that I have reviewed and am accepting and agreeing to be bound by the terms of the Agreement. I also acknowledge and agrees [sic] that by clicking on the "Acknowledge" button, I am binding myself to the Agreement just the same as if I had signed the Agreement in ink.

Dkt. 8-2 at 8; *see also* 19-1 at 15 ("I understand that I have received and read the Agreement, understand its terms, and have voluntarily decided to accept the terms of the [A]greement.").

Plaintiff argues that the Acknowledgement was not conspicuous and cites to *Williams v. DDR Media, LLC*, No. 22-cv-03789 SI, 2023 WL 2314868, at *7 (N.D. Cal. Feb. 28, 2023), *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856-857 (9th Cir. 2022), and *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025), in support, but each is distinct from the instant case. Here, the text is visible and clear, the language plainly and explicitly provides notice that clicking the "Acknowledge" button would constitute assent to a binding arbitration provision, and Plaintiff's exhibit demonstrated he "acknowledge[d]" the "Arbitration Agreement 2023" at the same time as the time stamp on Defendant's Acknowledgement exhibit. Dkt, 8-2 at 4–6, 8; Dkt. 17-1 at 4; Dkt. 19-1 at 15.

Finally, Plaintiff relies upon *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 761–62 (9th Cir. 1997), and *Kummetz v. Tech Mold, Inc.*, 152 F.3d 1153, 1156 (9th Cir. 1998), to argue that Defendant failed to prove Plaintiff knowingly waived the judicial forum in exchange for arbitration. In *Nelson*, however, the court found the plaintiff did not knowingly waive his right to a judicial forum because:

> Nothing in that acknowledgment notified [the plaintiff] either that the Handbook contained an arbitration clause or that his acceptance of the Handbook constituted a waiver of his right to a judicial forum in which to resolve claims covered by the ADA. Under the express terms of the acknowledgment, [the plaintiff] agreed only to "read and understand" the Handbook. He did *not* agree to be bound by its provisions.

119 F.3d at 761. Citing *Nelson*, the court in *Kummetz* found the same, reasoning that "[t]he Acknowledgement did not notify [the plaintiff] that the Booklet contained an arbitration provision, nor did it mention or imply anything about employment-related disputes … or waivers of remedies." 152 F.3d at 1155.

Here, however, the Acknowledgement identified the binding document as an "Agreement," stated that the Agreement contained an arbitration provision, explicitly stated Plaintiff will be bound by the arbitration provision, and explained the Agreement required that disputes be submitted to arbitration rather than to a judge or jury. Dkt. 8-2 at 8; *see also* Dkt. 19-1 at 15. In *Kummetz*, the Court expressly limited the reach of its holding by observing that a party cannot avoid arbitration merely because he failed to read the Acknowledgement:

> We do not mean to suggest that one who is aware that he or she is entering a contract may avoid its effect by failing to read it. Such a rule would undermine reliance on written instruments. The problem in [the plaintiff's] case is that nothing in the Acknowledgement that he signed or the circumstances of record suggested that he was entering a contract. His waiver lacked the explicitness required by *Nelson,* 119 F.3d at 762.

152 F.3d at 1156 (citations omitted).

Plaintiff's lack of recall is not sufficient to raise a genuine issue of material fact that he assented to the Agreement, especially where Plaintiff has admitted he "Acknowledge[d]" the "Arbitration Agreement 2023" and failed to identify any specific reasons to doubt the accuracy of Defendant's declarations and exhibits. Dkt. 17-1 at 4; *Saeedy*, 757 F. Supp. 3d at 1197 (collecting cases); *Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 942 (N.D. Cal. 2023) (plaintiffs' bare assertion they did not recall process and "may not have read" terms did not overcome evidence they checked a box agreeing to terms); *Blanford v. Sacramento County,* 406 F.3d 1110, 1113 n. 3 (9th Cir. 2005) (noting that a court considering summary judgment may accept defendant's version of plaintiff's conduct where plaintiff merely testifies that he does not remember a particular act).

Accordingly, Defendant has shown assent where Plaintiff received the Acknowledgment on or around his first day of employment and "[a]cknowledged" it three days later. Dkt. 8-2 at 2–6, 8–9, 12–17; Dkt. 17-1 at 2, 4; Dkt. 17-2 at 2–4; Dkt. 19-1 at 2–4, 6, 8–13, 15.

Because there is no genuine dispute of material fact as to whether an agreement to arbitrate was formed, the Court rejects Plaintiff's request for limited discovery on the issue of formation and the parties' request for oral argument. *See* Dkt. 17 at 21; *see, e.g.*, *Ward v. Amazon.com Servs. LLC*, No. C25-1671-KKE, 2026 WL 915049, at *7–8 (W.D. Wash. Apr. 3, 2026) (declining to hold an evidentiary hearing).

**B. The Delegation Clause Is Not Unconscionable and All Further Threshold Questions of Enforceability Must Be Decided by an Arbitrator**

Plaintiff does not dispute that the Agreement encompasses his claims. *See* Dkt. 8 at 13–14 (raising the argument that Plaintiff's claims are within the scope of the Agreement). Rather,

he challenges the Agreement's enforceability, arguing that the Agreement is unconscionable. Dkt. 17 at 10–21.

Where there is "clear and unmistakable" evidence that the parties delegated threshold arbitrability questions in their agreement to an arbitrator, it is the arbitrator rather than the court that determines the scope of the agreement. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) (citations omitted). "Arbitrable threshold issues may include ... whether the arbitration agreement is unconscionable." *Fli-Lo Falcon*, 97 F.4th at 1199 (citation modified).

The parties clearly and unmistakably delegated the question of arbitrability to the arbitrator. Dkt. 17 at 12 (arguing that the Agreement delegates to the arbitrator any dispute relating to the interpretation, applicability, or enforceability of the Agreement, including "employee-side gateway challenges to arbitration" but reserves all threshold challenges to class, collective, group, and representative waivers exclusively for a court). Here, the Delegation Clause plainly states an arbitrator shall have the exclusive authority to resolve any dispute relating to the enforceability of the Agreement:

> **[T]he arbitrator, and not any federal, state, or local court, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this Agreement.** However, the preceding sentence shall not apply to the waivers of "Class, Collective, and/or Group Actions" (Section 8) and "Representative Actions" (Section 9) described below. Regardless of anything else in this Agreement, and/or the AAA rules or procedures, any dispute relating to the interpretation, applicability, or enforceability of the waivers of Class, Collective, and/or Group Actions (Section 8) and Representative Actions (Section 9) in this Agreement may only be determined by a court and not an arbitrator.

Dkt. 8-2 at 12 (emphasis added); *Rent-A-Center*, 561 U.S. at 68–72 (finding that the provision that gave the arbitrator "exclusive authority to resolve any dispute relating to the ... enforceability ... of this Agreement" delegated to the arbitrator the threshold question of whether the Agreement was unconscionable); *see e.g.*, *Showalter*, 754 F. Supp. 3d at 1080 (finding

plaintiff's contention that the arbitration agreement was unconscionable was an argument about the "enforceability" of the agreement, which was squarely contemplated by the delegation clause).

However, the court must still address any challenges of unconscionability to the Delegation Clause itself. *Tompkins*, 840 F.3d at 1032 (acknowledging the court's authority to review a plaintiff's challenge to the validity of the precise agreement to arbitrate on the grounds that it is unconscionable); *see Rivas v. Coverall N. Am., Inc.*, 842 F. App'x 55, 56 (9th Cir. 2021), *cert. granted, judgment vacated,* 142 S. Ct. 2859, 213 L. Ed. 2d 1084 (2022) ("The court answered the questions put to it by [the defendant]; it simply ruled on the enforceability of a provision that it was asked to enforce.").

State law may supply grounds for declaring a contract unenforceable, including state unconscionability law. *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 686–87 (1996). Washington recognizes two categories of unconscionability: substantive and procedural. *Adler v. Fred Lind Manor*, 103 P.3d 773, 781 (2004). "Procedural unconscionability is the lack of meaningful choice, considering all the circumstances surrounding the transaction including the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms were hidden in a maze of fine print." *Zuver v. Airtouch Commc'ns, Inc.*, 103 P.3d 753, 759 (2004) (citations and internal quotation marks omitted). "Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh." *Adler*, 103 P.3d at 781. "Shocking to the conscience, monstrously harsh, and exceedingly calloused are terms sometimes used to define substantive unconscionability." *Id.* (citations and internal quotation marks omitted).

Either form of unconscionability "is sufficient to void the agreement." *Burnett*, 470 P.3d at 495 (citation and internal quotation marks omitted). "The burden of demonstrating that an arbitration agreement is not enforceable is on the party opposing the arbitration." *Id.* at 491. "A party is … permitted … to challenge the enforceability of a delegation clause by explaining how 'unrelated' provisions make the delegation unconscionable." *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1002 (9th Cir. 2023). However, the party must explicitly address the delegation provision itself; any challenge to the validity of the Agreement as a whole or to unrelated sections of the Agreement that do not challenge the delegation provision as applied is a question of enforceability for the arbitrator. *Id.*; *Rent-A-Center*, 561 U.S. at 72–76.

1. The Delegation Clause and the Underlying Agreement Are Not Procedurally Unconscionable

Plaintiff argues that the Agreement, including the Delegation Clause, is procedurally unconscionable "because of the circumstances of its formation and Plaintiff's lack of meaningful choice." Dkt. 17 at 10. Specifically, Plaintiff argues he lacked meaningful choice because (1) the contract is one of adhesion, and (2) the Delegation Clause is hidden. Dkt. 17 at 10–12.

First, Plaintiff argues he was pressured to sign the document "promptly before beginning work" and that this was unreasonable for a layperson with no legal training given that, in addition to being a contract of adhesion, the Agreement was eight pages long, substantively complex, filled with statutory references and legal jargon, and accompanied by approximately ten other onboarding documents. Dkt. 17 at 11. However, as Defendant points out, "adhesion [alone] is insufficient to support a finding of procedural unconscionability under Washington Law." *Wiseley v. Amazon.com, Inc.*, 709 Fed. App'x. 862, 863–64 (citing *Zuver*, 103 P.3d at 760). Here, Defendant demonstrates that Plaintiff had at least three days to review the terms

before he accepted them. Dkt. 8-2 at 2–6; Dkt. 19-1 at 3–4, 6, 8–13. Moreover, Plaintiff makes no allegations that his employer refused to answer questions or discuss the Agreement; he only argues that his employer did not proactively address the Agreement with him. Dkt. 17-2 at ¶¶ 5, 11, 12. Thus, Plaintiff had three days to read the eight-page Agreement along with the other onboarding documents, ask questions, seek advice, and develop an understanding of the Agreement before he accepted it on his third day of employment with Defendant.

These circumstances do not amount to a lack meaningful choice, especially where Plaintiff understood that the terms in the onboarding documents were a condition of his employment and therefore also should have understood the importance of reading and understanding the terms. Dkt. 17 at 11; Dkt. 17-2 at 4; *cf. Burgess v. Buddy's Nw. LLC,* No. 15-CV-578-BHS, 2016 WL 7387099, at *3 (W.D. Wash. Dec. 21, 2016) ("The fact that Defendant was given only one day to inspect the agreement is concerning. Nonetheless, under the entirety of the circumstances, the Court finds it is insufficient to support a finding that defendants exerted any 'undue pressure' on Plaintiff.").

Second, Plaintiff argues that the Delegation Clause involves an unfair element of surprise as it is "buried in Section 3 of 14, is unnumbered and untitled, and contains nothing in the text to alert employees to its presence." Dkt. 17 at 11. However, the Court agrees with Defendant that the clause is not hidden. It is appropriately located in Section 3 of the Agreement, labeled "Claims Subject to Arbitration," and written in the same font and text as the remainder of the section. Dkt. 8-2 at 12. That an appropriately labeled section contains two paragraphs instead of one does not amount to "a maze of fine print." *Adler*, 103 P.3d at 784.

Accordingly, Plaintiff did not lack meaningful choice, and neither the Agreement, nor the Delegation Clause, is procedurally unconscionable.

2. The Delegation Clause Is Not Substantively Unconscionable

"In deciding whether a delegation clause is unenforceable, our analysis is not limited to the bare text of the clause." *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 680–81 (9th Cir. 2024). "A party is ... permitted under *Rent-A-Center* to challenge the enforceability of a delegation clause by explaining how 'unrelated' provisions make the delegation unconscionable." *Holley-Gallegly*, 74 F.4th at 1002.

Plaintiff argues the Delegation Clause is substantively unconscionable because it "operates within a deeply asymmetrical architecture that gives Defendant unilateral control over threshold enforceability determinations." Dkt. 17 at 12. Plaintiff believes that the Agreement's exceptions in Section 8 ("Class, Collective, and/or Group Actions"), Section 9 ("Representative Actions"), and Section 11 ("Mass Arbitrations") allow Defendant to carve out related threshold questions and dictate the "timing, forum, and economics of gateway enforceability." Dkt. 17 at 12–13.

However, these terms are typical and representative of the parties' right to specify the terms to which they agree to arbitrate. *See, e.g.*, *Walz v. Walmart Inc.*, No. 3:23-CV-06083-BHS, 2024 WL 2864230, at *7–8 (W.D. Wash. June 6, 2024); *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (finding an agreement to arbitrate which carved out challenges to class action, collective action, and representative action waivers was not unconscionable); *see also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018) ("The parties before us contracted for arbitration. They proceeded to specify the rules that would govern their arbitrations, indicating their intention to use individualized rather than class or collective action procedures. And this much the Arbitration Act seems to protect pretty absolutely.").

Because arbitration proceedings are traditionally individualized and informal in nature, a state law defense permitting any party to demand class-wide proceedings would fundamentally change the arbitration process. *Walz*, 2024 WL 2864230, at *8 (citing *Lewis*, 584 U.S. at 508 and *Conception*, 563 U.S. at 338); *Lewis*, 584 U.S. at 508 ("attacking (only) the individualized nature of the arbitration proceedings, the employees' argument seeks to interfere with one of arbitration's fundamental attributes"). Plaintiff does not point to any authority or applicable statutory scheme that is otherwise in conflict with these terms. *See generally* Dkt. 17 at 12–17.

Moreover, the Agreement's mass arbitration terms, located in Section 11, do not render the Delegation Clause so asymmetrical as to amount to substantive unconscionability. Dkt. 17 at 14–17. The Plaintiffs' four arguments to the contrary are not persuasive.

First, Plaintiff argues that Section 11 gives Defendant "unilateral control over whether employees' individual arbitrations become subject to a fundamentally different single multi-claimant consolidated procedure" without a geographic limitation. However, not only do the terms appear consistent with the American Arbitration Association's Mass Arbitration Supplementary Rules, but also the procedure of mass arbitration is not one that is *per se* substantively unconscionable. *Mass Arbitration Supplementary Rules*, Am. Arb. Ass'n (Apr. 1, 2024), https://www.adr.org/media/ofkbtyz2/mass-arbitration-supplementary-rules.pdf; *see e.g.*, *Kohler v. Whaleco, Inc.*, 757 F. Supp. 3d 1112, 1128–29 (S.D. Cal. 2024).

Plaintiff suggests that he could be "swept into" a proceeding that consists of "different states, against different [third-party] entities[,]" but Section 11 provides an additional protection that requires Defendant to seek a court ruling that mass arbitration is appropriate before it may proceed. Dkt. 8-2 at 15–16 ("If the Court agrees that the subject arbitrations meet the definition of a Mass Arbitration set forth above, then the Company and/or a Beneficiary Party shall have

the right to have all such arbitrations consolidated into a single multi-claimant arbitration before a single arbitrator[.]"). Accordingly, Plaintiff's argument is premature and any real concerns about geography or joined parties can be presented upon Defendant's pursuit of a court ruling on mass arbitration. There is currently no live controversy, as Plaintiff has failed to allege he will be swept into such a case.

Plaintiff's use of *Heckman v. Live Nation Ent., Inc.* is inapposite and fails to support his argument against the nature of aggregate arbitration. 120 F.4th 670, 688 (9th Cir. 2024). In *Heckman*, one of many reasons the court found the agreement unconscionable was because the consolidated cases were "batched," the batches were unilaterally chosen by the arbitration entity, and the claimants in the non-bellwether cases would not receive notice of "the [controlling] decision in the bellwether case … until that decision [was] invoked against them[.]" 120 F.4th at 684.

Here, Section 11 does not purport to create a bellwether or batch procedure that would otherwise compromise Plaintiff's rights. Dkt. 8-2 at 15 ("[E]ach claimant's Claims must be determined individually."); *see e.g.*, *Jones v. Starz Ent., LLC*, 129 F.4th 1176, 1182 (9th Cir. 2025) ("The consolidation here implicates none of those concerns: no claimant is at the mercy of another claimant's representation of her.").

Second, Plaintiff argues that Section 11 allows Defendant to "freeze proceedings" and "trap employees in procedural limbo." Dkt. 17 at 15. However, Section 11 includes a temporal limit applicable to any stay: Defendant can only stay an arbitration while seeking a judicial declaration regarding the mass arbitration mechanism. *Id.*; Dkt. 8-2 at 14 ("[T]he Company shall have the right to stay all such arbitrations while it applies to a court of competent jurisdiction for

a declaration that the arbitrations qualify as a Mass Arbitration. During the period that this application is pending, all arbitrations subject to this Agreement shall be stayed[.]").

In support of his argument, Plaintiff directs the Court to *MacClelland v. Cellco P'ship*, in which the arbitration agreement prohibited injured parties from filing their claims in arbitration until all preceding bellwether cases were adjudicated. 609 F. Supp. 3d 1024, 1042 (N.D. Cal. 2022). There, the court found the agreement unconscionable and reasoned that the prohibition created circumstances in which "[t]hose in the queue who [were] not able to file within the limitations period would be forever barred." *Id.*

Here, in contrast, Section 11 does not prohibit an injured party from filing a claim at any time. *See* Dkt. 8-2 at 14–15. Rather, Section 11 contemplates claims that have already been asserted. *Id.* Accordingly, Section 11 does not present the same unconscionable effect as the mass arbitration provision in *MacClelland*.

Third, Plaintiff argues that Section 11 is one-sided because it allows Defendant to reduce its fee obligation to a single fee for the entire mass arbitration. Dkt. 17 at 15–16. Plaintiff cites *Gustin v. Club Demonstration Servs., Inc.*, No. 1:25-CV-00579-JLT-FJS, 2026 WL 1948873, at *10 (E.D. Cal. July 6, 2026), to stand for the proposition that "a procedure designed to control [mass arbitration] costs at employees' expense is inherently one-sided." Dkt. 17 at 16. However, *Gustin* specifically takes issue with the one-sided benefit of aggregating claims through a bellwether or batch proceeding that is "intentionally designed to avoid individual, bilateral adjudication of claims" to reduce costs while simultaneously reducing the claimants' procedural protections. 2026 WL 1948873, at *9–11.

As previously addressed, however, Section 11 expressly retains bilateral adjudication and does not purport to create a bellwether or batch procedure that would otherwise compromise

Plaintiff's procedural rights. Dkt. 8-2 at 15 ("[E]ach claimant's Claims must be determined individually."); *see e.g.*, *Jones*, 129 F.4th at 1182 ("The consolidation here implicates none of those concerns: no claimant is at the mercy of another claimant's representation of her.").

Further, Section 11 merely appears to clarify Defendant's fee responsibilities. Defendant has assumed responsibility for all arbitration fees "where required by law" and half of all other arbitration fees. Dkt. 8-2 at 13 ("The Company will pay the arbitrator's fees and any other administrative fees unique to arbitration, where required by law. … If applicable law does not require that the Company pay all fees and costs unique to arbitration, then arbitration fees and costs will be split by the Parties equally."). Rather than create a procedure that logistically and financially benefits Defendant at the expense of Plaintiff's procedural protections, Section 11 appears to clarify that, upon initiating a mass arbitration, the Defendant will assume responsibility for the mass arbitration filing fee rather than the previously agreed upon individual filing fee. *Compare* Dkt 8-2 at 13 ("You will be responsible for paying the equivalent of court filing fees, and the Company will pay all other fees unique to arbitration. For example, if the filing fee for a Complaint in court is $400, You would be required to pay up to $400 towards the initial filing fee for arbitration.") *with id.* at 15 ("[T]he Company and/or a Beneficiary Party shall be required to pay only a single filing fee for the Mass Arbitration.").

Fourth, Plaintiff argues that Section 11 revokes a claimant's "procedural autonomy" by forcing the claimant into aggregate arbitration. Dkt. 17 at 16–17. However, Plaintiff fails to show how the mass arbitration procedures contemplated in Section 11 are procedurally unfair or inefficient. Plaintiff cites *Valve Corp. v. Abbruzzese*, No. 2:24-CV-1717-JNW, 2026 WL 1481630 (W.D. Wash. May 27, 2026), to stand for the proposition that "a rule permitting the drafter to shift between court and arbitration is not mutual consent." Dkt. 17 at 16 (quotations

omitted). However, in *Valve Corp.*, a defending party attempted to shift the forum from arbitration to the court by binding the claimants to a new agreement *after* the claimants had already filed their claims in arbitration pursuant to the parties' original agreement. 2026 WL 1481630 at *9–12. Similar circumstances do not exist in the instant case.

Accordingly, Section 11 is not so asymmetrical, one-sided, or overly harsh as to amount to substantive unconscionability.

3. Whether the Agreement Is Substantively Unconscionable and Whether Any Unconscionable Provision Can Be Severed Are Questions for the Arbitrator

Plaintiff also argues that the Agreement is "independently substantively unconscionable" and challenges the Agreement's fee shifting provision, confidentiality requirements, and reservation of the right to cure challenged omissions. Dkt. 17 at 17–19. Plaintiff further argues that "the whole contract should be stricken" because unconscionable terms permeate the Agreement. Dkt. 17 at 19. However, these challenges are for the arbitrator to decide, not the Court.

"[I]f a party cites provisions outside of the delegation clause in making an unconscionability challenge, it must explain how those provisions make *the fact of an arbitrator deciding arbitrability* unconscionable." *Holley-Gallegly*, 74 F.4th at 1002 (emphasis in original) *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009–10 (9th Cir. 2023) ("[A] party resisting arbitration must mention that it is challenging the delegation provision and make specific arguments attacking the provision in its opposition to a motion to compel arbitration.")

Here, Plaintiff fails to meet his burden to challenge the Delegation Clause itself when he argues the Agreement is independently substantively unconscionable and fails to show how the fee shifting provision, confidentiality requirements, and reservation of the right to cure

challenged omissions are unconscionable as applied to the Delegation Clause. Dkt. 17 at 17–19; *Rent-A-Center*, 561 U.S. at 71 (2010) ("[I]n an employment contract many elements of alleged unconscionability applicable to the entire contract (outrageously low wages, for example) would not affect the agreement to arbitrate alone. But even where that is not the case … we nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene."); *see, e.g.*, *Showalter*, 754 F. Supp. 3d at 1079–80; *see also Caremark*, 43 F.4th at 1034 (rejecting arguments regarding "the enforceability of the arbitration provision as a whole," where the party "d[id] not call into question the district court's authority to enforce the *delegation clause*," in particular) (emphasis in original); *Brennan*, 796 F.3d at 1132 (affirming the district court's decision to dismiss claims in favor of arbitration because plaintiff did not challenge the delegation clause specifically); *Ligeri v. Amazon.com Servs. LLC*, No. 2:25-CV-00764-JHC, 2025 WL 2161497, at *2 (W.D. Wash. July 30, 2025) ("[T]he Supreme Court clarified that for such a contract, the challenging party cannot merely attack the arbitration agreement as a whole. Rather, the party must 'challenge[] the delegation provision specifically.'") (quoting *Rent-A-Center*, 561 U.S. at 72–74).

**C. The Agreement Requires Plaintiff to Proceed in His Individual Capacity**

Under Section 8 of the Agreement, the parties expressly reserve for the Court "whether any Claims must proceed on a class … basis." Dkt. 8-2 at 14; Dkt. 8 at 14; Dkt. 17 at 20. Because the parties agree that the Agreement "shall be enforceable under the substantive and procedural provisions of the Federal Arbitration Act," the Agreement's class action waiver under Section 8 is enforceable. Dkt. 8-2 at 15; *Walz*, 2024 WL 2864230, at *8 ("[T]he [c]ourt is bound by Supreme Court precedent defining the scope of [9 U.S.C.] § 2's saving clause. Under this precedent, the contract's class action waiver is not unconscionable, and the state-law

unconscionability defense … is inapplicable."); *Coneff v. AT&T Corp.*, 673 F.3d 1155, 1158–60 (9th Cir. 2012) (holding the FAA preempts Washington state law that invalidates class action waivers as substantively unconscionable); *Larios v. Twp Bldg. Servs., Inc.* 2025 WL 3172309 at *2 (9th Cir. 2025) ("[T]he district court erred in concluding that the arbitration agreement was substantively unconscionable because it contained a class action waiver. The FAA preempts state court decisions prohibiting class action waivers as unconscionable.").

Plaintiff argues that the Court should deny Defendant's request to strike the class allegations, but this argument implies the Court should in fact permit Plaintiff to bring a class action against Defendant. Dkt. 17 at 20. Doing so would require the Court to strike the Agreement's class action waiver provision, which states, "[t]he Parties agree that each may bring and pursue Claims against the other only in their individual capacities, and not on behalf of, with respect to, joined with, and/or as a part of, any class, collective, and/or group action[.]"

The Court is foreclosed from granting such relief. *Lewis v. DG Strategic VII, LLC*, 821 F. Supp. 3d 1267, 1276 (W.D. Wash. 2026) (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011)).

Accordingly, pursuant to the express language of the Agreement in which the parties agreed to waive class or collective action claims, Plaintiff's class claims are **DISMISSED**.

## IV. CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following:

(1) Defendant's Motion to Compel Arbitration (Dkt. 8) is **GRANTED**;

(2) Plaintiff's class claims are **DISMISSED** pursuant to the express language of the agreement in which the parties agreed to waive class or collective action claims;

(3) The parties shall initiate arbitration pursuant to the terms of the Agreement;

(4) Pursuant to 9 U.S.C. § 3 and upon Defendant's request for a stay, the Court **STAYS** this matter until the arbitration has concluded; and

(5) **Within 21 days** of the conclusion of the arbitration, the parties shall jointly submit a status report as to what further action the Court should take.

Dated this 6th day of November, 2026.

Grady J. Leupold
United States Magistrate Judge